**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | Case No: 11bk33448 |
| | ) | |
| Steven Sorensen & Tina Sorensen, | ) | Chapter 7 |
| | ) | |
| Debtors. | ) | Judge LaShonda A. Hunt |

## MEMORANDUM OPINION

This matter is before the Court for ruling after an evidentiary hearing on the motion for civil contempt filed by Steven Sorensen and Tina Sorensen (collectively, "Debtors") against creditor Keith Schallenkamp, and counsel who represented Keith in two state court collection actions, Paulson Law Firm PLLC and Eich Law Office, Prof. LLC (collectively, "Respondents"). Debtors assert that Respondents violated the discharge injunction by attempting to collect a previously discharged unsecured debt they owed to Keith. Respondents opposed the motion, contending that their actions were lawful. Upon consideration of the record and the written submissions of the parties in this contested proceeding, the Court finds in favor of Debtors and sanctions Respondents as set forth herein. This decision constitutes the Court's findings of fact and conclusions of law under Fed. R. Civ. P. 52(a), made applicable by Fed. R. Bankr. P. 7052, and as applied to contested matters by Fed. R. Bankr. P. 9014(c).

## BACKGROUND

The relevant facts have been drawn from the pretrial stipulations, witness testimony, and admitted evidence. The Court also takes judicial notice of the dockets in this bankruptcy case and any other related litigation. *See Inskeep v. Grosso (In re Fin. Partners)*, 116 B.R. 629, 635 (Bankr. N.D. Ill. 1989). The facts are mostly uncontested, but the record contains some contradictory positions that the Court will resolve.

1

I.      **Debtors' 2011 Bankruptcy Case**

Steven Sorensen and his wife Tina filed a joint voluntary chapter 7 bankruptcy petition on August 16, 2011.  Their financial woes began when Steven was fired from MF Global around 2006.  Believing that his termination was in retaliation for refusing to conduct illegal trades, Steven sued his former employer and others in state court, *Sorensen v. Greg Arenson, et al.*, Circuit Court of Cook County, Law Division, 2009-L-012205, seeking millions in damages.

Steven struggled to find a new job sufficient to support his family and pay his legal bills. He accused MF Global of blackballing him with other brokerage houses.  Desperate for funds, Steven sought loans from various sources that he promised to repay with proceeds from the wrongful termination litigation.  Keith Schallenkamp, his stepbrother who was also an Army Reservist, agreed to help.   Keith and Steven have never met in person.  Rather, they were connected by Steven's mother, Shirley Schallenkamp, who was married to Keith's father. Exactly how discussions about the loan to Steven unfolded is unclear.  Keith may have told Shirley that he had been saving up substantial sums of money from his military service and other jobs, and she, in turn, mentioned to Keith the opportunity to invest in Steven's litigation.   Or Keith, out of the goodness of his heart, simply wanted to help a struggling family member. Either way, in July 2009, Keith received the following email from Shirley's email address with contact information for Debtors:

From: Shirley <schallenkamp@triotel.net>
Sent: Friday, July 3, 2009 4:38 PM
To: Keith Schallenkamp
Subject: Steven Sorensen Investment

Hi Keith, per our discussion, money lent to fund our case will be paid a return of 3 % per month with the principle, accumulated interest and all wire fee expenses paid back to you when I either acquire other funding or a settlement is received in our case. It is a joint checking account. The names on the account are Steven L. Sorensen and Tina L. Sorensen and is held at Harris Bank Frankfort in Frankfort, IL. The routing number is #071025661 and the account number is #2004518. I'll keep you updated and be in touch with you periodically to discuss future deposits. Thank you for your support, feel free to call me anytime.

Steve  708-829-6540 or 708-821-7800
Tina   708-829-6560

(Debtors' Group Ex. 11, Schallenkamp Emails & Texts 0001).[1]  No evidence was presented about a specific loan amount or a signed formal agreement.  But from July 2009 until January 2012, Keith sent funds to Debtors twice a month in varying amounts ranging from $600 to $2,500.

Despite never having met face-to-face, Steven, and Keith became close friends.  Keith would check in with Steven frequently about the status of the case and his family.  Keith would also lend Steven extra money around the holidays, and Keith continually proposed work and investment ideas to Steven who held only odd jobs after his termination.

In June 2011, the state trial court dismissed Steven's lawsuit against MF Global with prejudice.  Steven appealed that ruling in July 2011.  However, MF Global hit a massive liquidity crisis and filed for chapter 11 bankruptcy protection in October 2011, essentially rendering Steven's claim against the company worthless.

Having incurred substantial debts while unsuccessfully pursuing the employment litigation and now facing eviction from their home, Debtors turned to bankruptcy in August 2011.  In the petition, they scheduled Keith as an unsecured creditor with an unliquidated debt of

---

[1]  Debtors did not explain how or why the email originated from Shirley's email account.  The parties stipulated that Shirley is 89 years old.  But no one called her to testify at the virtual evidentiary hearing held on Zoom.

3

$6,000 for personal loans from 2009 to 2010 and listed for him an address of "2-361st TSBn, P.O. 616, El Paso, Texas 79906." According to Keith, neither the loan amount nor the mailing address was correct. The pre-petition debt amounted to $66,000.[2] Furthermore, Keith explained that he had given Shirley that specific address—with a P.O. Box of 6616, not 616—for emergencies only during his involuntary mobilizations. Keith testified that this military address did not exist in June 2009 when he began loaning funds to Debtors, and they should have sent notices to his permanent address in South Dakota. Keith conceded that he was physically located in the El Paso, Texas area from 2009 through 2015 on military duty. Although Debtors established that he received a piece of personal mail at that military address in May 2009, the record also reflects other mailing addresses in El Paso for Keith in April 2010, July 2010, and July 2011. (Debtors' Group Ex. 13, Paulson 00118-00121).[3]

The parties also disputed when Keith first learned about Debtors' bankruptcy filing. Steven claimed that Keith received written notice from the Court and called him in September 2011, angry that he had been included in a bankruptcy petition. Keith denied that conversation occurred, and stated even though he and Steven talked weekly, they never discussed bankruptcy and Steven did not ask him for a current address. Before trial, though, the parties stipulated that Keith loaned Debtors an additional $3,020 between September 6, 2011, and January 2, 2012—post-petition—without notice of filing of the bankruptcy case.

Likewise, Keith stipulated to receipt of verbal notice of the bankruptcy filing not later than Spring of 2012. Yet at trial, he conceded that Shirley emailed him on February 11, 2012,

---

[2] Actually, the parties stipulated that between July 2009 and August 2011—pre-petition—Keith loaned Debtors around $72,084.

[3] Shirley appeared to have played a prominent role in the address confusion but, again, neither Debtors nor Keith presented her as a witness.

mentioning Steven's bankruptcy.  Keith further admitted that by May 2012, he knew about the bankruptcy case but did not challenge dischargeability of his debt on any grounds.  In multiple oral and written communications, Steven assured Keith that although he was required by bankruptcy law to list both Keith and Shirley in the petition, Steven still intended to pay each of them back in full for the loans provided.[4]  Keith gave Steven until May 2012 to commence repayment.  When Steven did not do so, Keith continued to demand the pre-petition and post-petition amounts and he encouraged Shirley to pressure Steven on Keith's behalf.

Debtors still had a pending bankruptcy case when many of Keith's collection attempts were occurring.  The chapter 7 trustee initially issued a finding of assets and had the Court serve notice on all creditors of the claims filing deadline.  However, the trustee declared this a no-asset case on June 26, 2012, and Debtors received their discharge on July 31, 2012.  Creditors were served with notice of the discharge pursuant to 11 U.S.C. § 727 on August 2, 2012.  Keith did not participate in the case at all.  And none of the bankruptcy notices sent to his military address, including the discharge order, were returned to the Court or the Bankruptcy Noticing Center as undeliverable.[5]

## II.     Post-Discharge Collections by Keith

Notwithstanding entry of the discharge order in July 2012, Keith continued to press Steven for money.  Collection efforts ranged from aggressive and threatening email and phone communications with Shirley and Steven, to pointed attempts to have Debtors reaffirm the pre-petition debt.  Keith maintained that Debtors committed bankruptcy fraud by providing deficient notice to him and misstating the amount he was owed.  In September 2012, Keith had a

---

[4]  Shirley had loaned Steven over $100,000.

[5]  The bankruptcy docket reflects that pursuant to U.S. Postal Service policy, the zip code for Keith was automatically changed from "79906" to "79944-0616."  Neither side raised this as a potential problem.

bankruptcy law firm review the docket and filings in Debtors' bankruptcy case, and he spoke with lawyers about his rights.  Keith testified that he knew the pre-petition loans could no longer be collected because of the discharge but he thought Steven's promises to repay him somehow revived the debt.  From June 3, 2014, to April 20, 2015, Debtors paid Keith $3,800 towards repayment of the $3,020 in post-petition loans.

In the meantime, Keith was participating in bankruptcy proceedings in Texas against an individual named Ellie Ramos ("Ramos").  He had sued Ramos for fraud in state court in August 2012 and obtained a default judgment in July 2013.  Ramos filed for bankruptcy, but Keith maintained that he did not receive timely notice of the filing.  To protect his interests, Keith drafted a letter to the bankruptcy court seeking an extension of time to file a nondischargeability action against Ramos based on the Servicemen's Civil Relief Act ("SCRA"), which allegedly tolled his legal rights during active military duty.  After the motion was granted, Keith and his business partner filed a *pro se* nondischargeability adversary proceeding against Ramos in October 2015 that proved successful.

### III.    Minnesota Lawsuit filed by Paulson

Following the Ramos victory in the Texas bankruptcy court, Keith escalated his collection efforts against Debtors.  Around June 2016, he hired attorney Rafael Miller of Miller Law Firm to file a fraud complaint in Minnesota where Keith had settled after his military service ended.  But Miller eventually withdrew from representing Keith and Jon Paulson of Paulson Law Firm PLLC substituted as counsel in his place.  According to an August 12, 2016, letter from Miller to Paulson, Miller had not yet filed a lawsuit "because of the [attached]

6

correspondence from [Debtors' former bankruptcy counsel][6] and the direction from Keith that [Miller] would no longer be his attorney." (Debtors' Group Ex. 12, MN Lawsuit 0018).

Paulson, a local Minnesota solo practitioner, was an experienced bankruptcy attorney who had filed over 100 chapter 7 cases and handled a variety of other bankruptcy litigation matters. On Keith's behalf, he filed an initial state court complaint in June 2017, and then an amended complaint in September 2017, alleging common law fraud and breach of contract against Debtors, and breach of fiduciary duty against Shirley. The complaints generally alleged that Keith had loaned Debtors $75,000 from July 2009 through January 2012, and that they failed to disclose significant information in the bankruptcy filing and misled him about their ability to repay. In addition, Keith alleged that Shirley acted as Debtors' broker in the transaction and was therefore liable for the debt as well. Paulson was aware of Debtors' bankruptcy, but he believed that Keith's debt was not discharged because Debtors did not include the full amount in the petition and Keith never received formal notice of the bankruptcy. Paulson did not conduct any research on Seventh Circuit bankruptcy precedent. Furthermore, he was not attempting to allege a fraud-based nondischargeability issue in the complaints.

Debtors retained counsel who immediately raised the bankruptcy discharge as a defense and provided citations to supporting case law. Eventually, defense counsel moved to dismiss the lawsuit for lack of jurisdiction, as Debtors resided in Illinois and Shirley resided in South Dakota. The state trial court granted the motion in March 2018.[7]

---

[6] The attachment was not included in the record.

[7] Keith was ordered to pay costs of $1,066 in the Minnesota litigation. It is unclear why that happened or if he ever satisfied the obligation.

IV.   **South Dakota Lawsuit filed by Eich**

Undeterred by the dismissal in Minnesota, Keith sought counsel in South Dakota to continue the litigation.  He found Robin Eich of Eich Law Office, Prof. LLC.  Eich was a solo practitioner based just outside of Sioux Falls, South Dakota, with over 20 years of legal experience in smaller community law, including estate planning, corporate work, and family law/custody cases.  She had done some consumer debt collection work but never handled any bankruptcy matters.  Eich received a referral for Keith's case and talked to him on the telephone, but they did not meet in person.  She felt pressured to get something on file quickly.  Keith told Eich that Shirley was about to receive an inheritance from the estate of her now-deceased husband—Keith's father—and he wanted to push her for a quick settlement to make this go away.

On June 8, 2018, Eich emailed Paulson asking for his case file, explaining that she was "not comfortable" starting a lawsuit without all the relevant information.  Paulson responded that he would send her everything.  (Debtors' Group Ex. 13, S.D. Lawsuit 0002).  Eich testified at trial that she did not recall talking to Paulson or any other bankruptcy attorney about whether Keith's debt was discharged.  Instead, she relied on Keith's evaluation of the nondischargeability of his debts based on advice that he told her he had received from bankruptcy lawyers.

On June 28, 2018, Eich filed a verified state court complaint in South Dakota against Debtors and Shirley.  Much like Paulson's Minnesota complaint, Eich's South Dakota complaint alleged breach of contract and fraud and deceit against Debtors, and breach of fiduciary duty against Shirley.  The complaint asserted that Debtors' failure to include Keith's correct address was a calculated and intentional act to ensure that he did not engage in their bankruptcy case.

8

The basis for suing Debtors was that Keith had loaned them $75,104 and they had repaid $3,800, leaving a balance due of $71,304.

Once again, Debtors retained local counsel to defend themselves, and counsel immediately moved to dismiss the complaint for lack of personal jurisdiction and for failure to state a claim since the debt had been discharged.  At the October 2018 hearing on the motion, the state court judge expressed serious concerns about the legal impact of the bankruptcy discharge on collection of the pre-petition debt and the weakness of Keith's case against Shirley.  But he believed factual issues existed that precluded dismissal at that time.  Eich emailed Keith, urging him to focus on the post-petition balance—which he believed to be $8,027—and to hire a bankruptcy attorney in Illinois to challenge dischargeability of the pre-petition debt.  Still, on multiple occasions, Eich continued to demand $50,000 from Debtors and Shirley to settle the case.  Even though Eich believed in November 2018 it would be best for Keith to retain different counsel, she did not withdraw from the South Dakota lawsuit.

Things came to a head around December 14, 2018, when Eich received a letter from CKB Lawyers, an Illinois bankruptcy firm, informing her that Keith's collection actions violated the chapter 7 discharge and requesting immediate dismissal of the pending lawsuit.  Upon receipt of the notice, Eich told Keith that she thought they should dismiss any action that sought to recover pre-petition debts and reiterated the need to focus on the post-petition balance.  Keith finally agreed in late December 2018, but Eich did not immediately file any documents in the South Dakota case reflecting that change.  In fact, Keith continued to insist that the post-petition loans accrued interest at the same 36% annual rate as the original pre-petition deal and thus a cash settlement of $50,000 was warranted.

Debtors refused to pay and instead decided to pursue sanctions against Respondents before this Court.  They initiated civil contempt proceedings in May 2019.  A month later, Eich moved in South Dakota to limit the scope of the case against Debtors to recover the post-petition debt only.  Debtors refused to agree to anything less than full dismissal.   In January 2020, Eich moved to amend the complaint to collect only debts not discharged by the bankruptcy court.  The South Dakota litigation has remained on hold pending resolution of this civil contempt motion.

Because Respondents each contested the civil contempt motion, this matter was set for an evidentiary hearing that was delayed due to the COVID-19 pandemic but finally proceeded via Zoom over three days in April 2021.  Keith, Paulson, Eich, Steven, Tina, and their daughter Amanda, all testified.  The parties have submitted proposed findings of fact and conclusions of law, and post-trial briefs, which the Court has thoroughly reviewed.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 151 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. This is a core proceeding under 28 U.S.C. § 157(b)(1).

## DISCUSSION

Section 727 of the Bankruptcy Code discharges chapter 7 debtors from all their debts, with a few exceptions.  The purpose of the discharge is to provide debtors with a "fresh start." *Marrama v. Citizens Bank of Mass*., 549 U.S. 365, 367 (2007).  That is accomplished through the discharge injunction: "a discharge in a case under this title— operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor. . .." 11 U.S.C. § 524(a)(2)

10

(2018).  This injunction affords debtors a broad scope of protection from the collection of prepetition debts.  *See In re Ajasa*, 627 B.R. 6, 16 (Bankr. E.D. N.Y 2021).

But section 524(a)(2) does not include "a mechanism that allows for a private right of action to enforce the discharge injunction."  *In re Haltermon*, 592 B.R. 311, 316 (Bankr. S.D. Ohio 2018).   Instead, violations of the discharge injunction are treated as civil contempt and section 105(a) of the Bankruptcy Code grants bankruptcy courts the authority to impose sanctions upon the offending party.  *In re Barr*, 457 B.R. 733, 735 (Bankr. N.D. Ill. 2011).  This authority, however, is limited.  *Taggart v. Lorenzen*, --- U.S. ----, 139 S.Ct. 1795, 1801, 204 L.3d.2d 129 (2019) ("Under traditional principles of equity practice, courts have long imposed civil contempt sanctions to 'coerce the defendant into compliance' with an injunction or 'compensate the complainant for losses' stemming from the defendant's noncompliance with an injunction.") (citations omitted).

In their joint pretrial statement, the parties identified three material issues to be resolved at the contested hearing: (1) whether Respondents violated the discharge injunction; (2) if so, did their actions proximately cause damage to Debtors; and (3) if so, what sanctions, if any, are warranted?

## I.      <u>Violation of the Discharge Injunction</u>

The evidence presented at trial established that Keith, Paulson, and Eich each violated the discharge injunction.  To prove a claim for violation of the discharge injunction, a debtor must show that "(1) the creditor was seeking to collect a debt that was in fact discharged, and (2) the creditor's action in doing so was willful."  *In re Parkland Props., LLC*, 605 B.R. 509, 525 (Bankr. N.D. Ill. 2019).  The debtor must establish by clear and convincing that the creditor's conduct was unlawful.  *See Barr*, 457 B.R. at 735.  Those requirements are easily met here.

11

A. **Discharged Debt**

Debtors established that Keith's unsecured debt was discharged under section 727 of the Bankruptcy Code in July 2012. Indeed, Keith stipulated to having been scheduled as an unsecured creditor in the bankruptcy case and then admitted he had actual notice of the filing almost six months before entry of the discharge order. Yet Keith did not prosecute an adversary proceeding against Debtors to declare his debt nondischargeable nor did he secure a written reaffirmation agreement from Debtors affirming their willingness to voluntarily repay the debt. It is well established that "[t]hese two methods—an adversary proceeding resulting in a judgment or a reaffirmation agreement—are the *only* ones through which a creditor can have a section 523(c) debt excepted from discharge." *In re Cashion*, Case No. 21-8085, 2022 WL 1180103, at *4 (Bankr. N.D. Ill. Apr. 22, 2022). Otherwise, "[t]he discharge generally eliminates the debtor's personal liability for all debts the debtor had on the petition date. . . and permanently enjoins their collection. . .." *Id*. at *3-4 (collecting cases) (citations omitted). *See also* 11 U.S.C. § 727.

Respondents offer a few reasons why the debt was not discharged but none are persuasive. First, they assert that because Keith's address was not properly listed on Debtors' schedules, under 11 U.S.C. § 342(g), he never received "appropriate notice;" consequently, his debt was excepted from the discharge order. But that argument goes nowhere, since Keith admittedly had *actual* notice of the bankruptcy filing from Steven and Shirley as early as February 2012, while the case was still pending. This informal notice provided Keith with ample opportunity to participate in the bankruptcy well before the discharge order was entered over five months later in July 2012.[8]

---

[8] The parties argue at length about whether Keith had actual knowledge of Debtors' bankruptcy filing in September 2011. But that debate is irrelevant considering their pretrial stipulation that Keith made post-petition

Respondents are correct that section 342 is entitled "Notice" and states in section 342(a) that notice "as is appropriate" must be given of an order for relief.  In particular, section 342(g)(1) says that "notice provided to a creditor by the debtor or the court other than in accordance with this section . . . shall not be effective notice until such notice is brought to the attention of such creditor."  11 U.S.C. § 342(g) (2018).  They seize upon that language to suggest that because the military address where Debtors mailed formal notice of the bankruptcy filing was wrong, did not exist, and/or was not available for Keith's personal use, then his debt is nondischargeable.  That contention is erroneous.

As an aside, the Court agrees with Respondents that Debtors failed to conclusively show that Keith actually received notices sent to his petition address.  Keith consistently disputed the validity and accuracy of that address during the relevant period.  Debtors point to a piece of personal mail Keith received in May 2009 at the correct post office box, 6616, and Steven's testimony about a couple of payments he sent to Keith, but do not acknowledge that the petition address is simply wrong.  While it is unusual that the bankruptcy notices were not returned to the Court or the Bankruptcy Noticing Center as undeliverable, that does not necessarily prove that they were delivered to Keith in 2011 or 2012.  Debtors' own exhibits reflect multiple mailing addresses for Keith in El Paso through 2010 and 2011, which matches Keith's testimony that his temporary address changed often during his involuntary mobilizations.

Regardless of the lack of proof of service on Keith, Respondents cannot sidestep the fact that Keith did know about the case.  Notice "as is appropriate" can be satisfied formally or informally.  Particularly in chapter 7 and 13 cases, actual knowledge of a pending bankruptcy case meets the due process requirement of notice.  *See In re Dartmoor Homes, Inc.*, 175 B.R.

---

loans to Debtors from September 2011 through January 2012, *without notice of the filing of the bankruptcy case.* (emphasis supplied).

13

659, 670 (Bankr. N.D. Ill. 1994); *In re O'Shaughnessy*, 252 B.R. 722, 730 (Bankr. N.D. Ill. 2000). Once creditors learn of a bankruptcy filing, they are aware that their interests might be in jeopardy and therefore must act to protect them.

Even the plain language of section 342(g)(1) contemplates that incorrect formal notice can be remedied by actual knowledge. *See In re Davis*, 498 B.R. 64, 69 (Bankr. D. S.C. 2013). If Respondents' statutory interpretation is correct—and it is not—then the automatic stay and discharge injunction would never apply to a creditor who knew about the filing but did not receive formal written notice of the case and the discharge order. Such a policy would lead to endless litigation over *how* a creditor found out about the case when the salient question for purposes of analyzing potential stay and discharge violations is *whether* the creditor knew or had reason to know of the filing. Once Keith knew about Debtors' bankruptcy case in February 2012, all collection activity for the pre-petition debt had to cease. Section 342 does not alter that requirement.

Second, Respondents assert that under 11 U.S.C. § 523(a)(3)(B), only the amount scheduled in the petition—$6,600—was discharged, since Debtors engaged in fraudulent behavior that rendered the balance nondischargeable under section 523(a)(2). As an initial matter, Paulson and Eich are wrong about the debt amount—Debtors listed $6,000, not $6,600. Regardless, none of the Respondents cited any legal authority to support their novel theory of a "partial discharge." And neither the facts nor the law is on their side.

Section 523(a)(3)(B) excepts from discharge any debt:

> neither listed nor scheduled. . .with the name . . . of the creditor to whom such debt is owed, in time to permit – if such debt is of a kind specified in paragraph (2), (4), or (6) of this subsection, timely filing of a proof of claim and timely request for a determination of dischargeability of such debt . . . unless such creditor had notice or actual knowledge of the case in time for such timely filing and request.

14

11 U.S.C. § 523(a)(3)(B) (2018).  One of the primary purposes of this provision is to ensure that creditors who may have suffered at the hands of a dishonest debtor are afforded an opportunity to prosecute their claims against that debtor.  *See In re Medaglia*, 52 F.3d 451, 455 (2d Cir. 1995).  But this section also "imposes a burden on [unlisted] creditors to come forward before the bar date. . . [as] it is well established that due process is not offended by requiring a person with actual, timely knowledge of an event that may affect a right to exercise due diligence and take necessary steps to preserve that right."  *Id.*  To prevail on a section 523(a)(3)(B) claim, then, two elements must be established: the alleged debt was not scheduled, and the creditor did not have notice or actual knowledge in time to file a proof of claim or challenge dischargeability.  *See In re Hardej*, 563 B.R. 855, 864 (Bankr. N.D. Ill. 2017).

The evidence in the record demonstrates that Keith's debt was scheduled.  He stipulated that his name was included in the creditor matrix and his loan listed in the petition, albeit with an incorrect amount.  And, as already discussed, Keith had actual knowledge of the bankruptcy case by February 2012, in ample time to determine what rights, if any, he might have had.  Accordingly, he was a scheduled and listed creditor.

Furthermore, section 523(a)(3)(B) applies only where creditors contend that a pre-petition debt was incurred fraudulently under sections 523(a)(2), (a)(4) or (a)(6).  Here, Keith complained primarily about Debtors' *post-petition* actions—alleged fraud in not properly informing him of the bankruptcy filing, continuing to accept loans, and promising to repay the discharged debt.  None of those facts would support a nondischargeability action for an intentional tort that occurred *pre-petition*.  And to the extent that Keith maintains Steven lied to him at the outset about his ability to repay these loans, the Court finds Keith was not a credible witness.  Based on the July 2009 email correspondence, Keith knew this was an "investment" to

15

"fund [Steven's wrongful termination suit]" that would be repaid at a whopping "3% interest per month" once Steven received "other funding" or a "settlement."

While Keith feigned surprise that Steven had so many other investors lined up to collect their share of the pie, the Court concludes that Keith knew and willingly accepted the inherent risks of a litigation funding deal in hopes of achieving a significant profit if and when Steven recovered millions in damages. Had MF Global not filed for bankruptcy, the investment might have proved lucrative. That Steven's lawsuit came up short does not elevate what is essentially a breach of contract claim—which is dischargeable—to a fraud claim—which would be nondischargeable. Keith had no viable cause of action to raise against Debtors under section 523(a)(3)(B). Even Paulson, an experienced consumer bankruptcy attorney, confirmed that fact at trial.

Moreover, Respondents' argument that the difference between the scheduled amount and the actual amount owed was nondischargeable and thus eligible for collection is illogical. Because Debtors had a no-asset bankruptcy, it does not matter whether the debt of an unsecured creditor was scheduled correctly or at all. *See In re Mendiola*, 99 B.R. 864 (Bankr. N.D. Ill. 1989). They had no non-exempt assets from which funds could be distributed to unsecured creditors. *Id.* at 867. As such, missing out on the opportunity to file a proof of claim really amounts to nothing. *Id.* "The unlisted creditor is not prejudiced by the debtor's failure to list him because he would not have received a distribution anyways." *Id.* (quoting *In re Smolarick*, 56 B.R. 720, 723 (Bankr. W.D. Va. 1986)). Accordingly, section 523(a)(3)(B) affords no basis for relief for Respondents. Keith's entire pre-petition debt was discharged in July 2012.[9]

---

[9] There is no dispute that the post-petition loans totaling $3,020 were not protected by the discharge injunction.

16

### B.    Willful Actions

The evidence at trial established that Respondents acted willfully in attempting to collect Keith's discharged debt in violation of the discharge injunction.  Specific intent is not required to show willfulness.  *In re Sterling*, 933 F.3d 828, 832 (7th Cir. 2019) (quoting *In re Radcliffe*, 563 F.3d 627, 631 (7th Cir. 2009)).  Instead, a willful violation "requires that the offending party both violated the court's order and had actual knowledge that a bankruptcy is underway or has ended in a discharge."  *Id.*  (quotations omitted).

The discharge order was entered in July 2012.  Keith testified that he consulted with bankruptcy lawyers in September 2012 who informed him that his debt was included in the bankruptcy.  More importantly, he admits to knowing then that the pre-petition debt was uncollectible due to the discharge order.  Yet he continued to pressure Debtors post-discharge from 2012 through 2016, to reaffirm or repay the discharged debt, all in clear violation of this Court's discharge order.

Similarly, Paulson and Eich are lawyers who filed nearly identical state court collection complaints against Debtors in 2017 and 2018, respectively, in which they acknowledged the pre-petition debt and bankruptcy filing while also seeking to collect the discharged amounts.  Both complaints referenced pre-petition loans that were not repaid and sought to recover approximately $71,000, which is consistent with the parties' pre-trial stipulation that Keith was owed about $72,000.  Even after Debtors' state court counsel gave Paulson and Eich relevant case law demonstrating their undeniable violations of the discharge injunction, they refused to back down.  That they mistakenly believed their client Keith, a layperson and soldier, had a viable partial discharge defense does not excuse their misconduct.  Licensed counsel have ethical obligations to fully investigate claims and ensure that they are proceeding in good faith.  Because

17

the actions of Paulson and Eich were negligent and willful, the Court finds that they too violated the discharge injunction.

## II.     Civil Contempt Finding

Under the circumstances detailed above, the Court concludes that the record adequately supports a finding that Respondents' many violations of the discharge injunction amount to civil contempt.  The Supreme Court explained the relevant standard as follows: "[a] court may hold a creditor in civil contempt for violating a discharge order if there is no fair ground of doubt as to whether the creditor's conduct might be lawful under the discharge order." *Taggart*, 139 S.Ct. at 1804.  The standard is an objective one. *Id.*

While a creditor's subjective intent is not always irrelevant, "civil contempt . . . may be appropriate when the creditor violates a discharge order based on an objectively unreasonable understanding of the discharge order or the statutes that govern its scope." *Id.* at 1802.  Relevant considerations include whether the creditor had received prior notice and/or had existing legal authority to support its belief that the conduct is not barred.  *See In re Kimball Hill, Inc*, 620 B.R. 894, 907–08 (Bankr. N.D. Ill. 2020); *In re Ann Terrell*, 614 B.R. 300, 305 (Bankr. N.D. Ill. 2020 (finding that the failure to demonstrate any reasonable basis for concluding conduct was lawful warranted imposing sanctions); *In re Shuey*, 606 B.R. 760 (Bankr. N.D. Ill 2019) (concluding that creditor's position was not objectively unreasonable where creditor could cite to authority that supported position).

Keith, Paulson, and Eich have failed to show that a fair ground of doubt exists as to the lawfulness of any of their actions here.  For the most part, their conduct was so obviously wrong and unsupported by any legal authority that the Court finds it patently unreasonable from the inception and throughout these proceedings.

18

Regarding Keith, he learned about Debtors' bankruptcy case while it was still pending. Not long after they received discharges, he sought advice from bankruptcy counsel who confirmed that his substantial pre-petition debt could no longer be collected from Debtors. Nevertheless, Keith persisted and pushed and prodded Steven and Shirley for money and exerted undue pressure on Debtors for nearly five years *before* initiating collection lawsuits against them in two different state courts miles away from Debtors' home.   Keith had litigated his own *pro se* nondischargeability action, so he knew that relief from a discharged debt had to be sought in the local bankruptcy court.  With even his limited nonlawyer understanding of the effect of the discharge, his actions were objectively unreasonable.

This Court had the opportunity to observe Keith during his testimony.  He presented as an intelligent soldier well aware of the tactics to use against his enemies.  He regularly employed those against Debtors and Shirley whom he believed had cheated him out of over $70,000. While his strong feelings of betrayal by trusted family members may be valid, it is also evident that Keith understood that collecting his debt would violate the discharge injunction.

Counsel here fare no better than Keith.  As licensed legal professionals, they are aware of their ethical obligations to clients and the Court.  Yet, Paulson, an experienced consumer bankruptcy lawyer who has filed over 100 chapter 7 bankruptcies, not only encouraged Keith to proceed on the Minnesota complaint but then he offered no plausible explanation to this Court for his utter misapprehension of basic bankruptcy concepts about the effect of a chapter 7 discharge.  The Court notes that at the time of the hearing, Paulson was suspended from the practice of law by the State of Minnesota.  His admitted failure to do any research at the time he represented Keith or years later in his defense at this hearing is extremely disturbing.  Paulson essentially argues that he was mistaken on the law even though Miller warned Paulson about

19

proceeding as Miller was withdrawing from representation.  Given that Paulson failed to present a shred of authority in support of his implausible defenses that unfortunately encouraged Keith to continue to obsessively pursue these discharged debts, the Court finds his claims of innocence unconvincing.  As a bankruptcy attorney, he knew or should have known and done better.

The Court is slightly more sympathetic to Eich.  Generally speaking, she was credible in her testimony about having good intentions but being unfamiliar with the nuances of this tricky area of the law.  Unlike Paulson, Eich had no bankruptcy expertise.  Still, her excuse that she relied on Keith, her client, to advise on the applicability of a complex legal subject, and her admission that she knew about Debtors' bankruptcy and proceeded with a collections lawsuit without talking to Paulson or any other bankruptcy attorney, is astonishing.  There is some evidence in the record suggesting that Eich tried to mitigate the harm to Debtors by persuading Keith to finally stop trying to collect the pre-petition loans.  But that took months of legal proceedings in South Dakota, a demand letter from an Illinois bankruptcy law firm, and civil contempt proceedings before she finally acknowledged the error of her ways at trial.

The Court notes that Debtors continue to face potential liability in South Dakota for what Keith estimated is a remaining post-petition balance of about $8,000 and for which Eich has inexplicably sought a $50,000 settlement based on an unsound theory of liability.  Hounding Steven's elderly mother for that amount of money smacks of a not-so-subtle attempt to circumvent the discharge injunction, especially since Keith stated his motive was to coerce his stepmother into paying a sizeable amount from the inheritance of her late husband's estate.

In the end, Eich advances the same halfhearted and unsupported defenses here as Paulson.  It bears repeating that their reliance upon subjective beliefs—rooted in their choice to stick their heads in the sand and not make the necessary pre-filing inquiries—does not come

close to creating lawful doubt.  Objectively speaking, Paulson and Eich each led Keith astray by keeping alive his false hope that he was entitled to be made whole by Debtors directly or by Shirley indirectly.  The Court cannot fully fault Keith for believing the lawyers who missed the mark here in advising him as a client.

Respondents urge the Court to decline to find them in civil contempt and instead hold that Debtors are equitably estopped from obtaining any relief due to their acceptance of post-petition loans from Keith and subsequent promises to repay the pre-petition debt.  When considering whether equitable estoppel is appropriate, this Court is guided by a four-factor test: "(1) the party to be estopped is aware of the facts; (2) the party to be estopped intended its acts or omissions to be acted upon; (3) the party asserting estoppel did not have knowledge of the facts; and (4) the party asserting estoppel reasonably relied on the conduct of the other party to his or her own substantial injury."  *In re Parker*, 264 B.R. 685, 692 (B.A.P. 10th Cir. 2001). Respondents have failed to show that the equities are in their favor.

It is true that Keith continued to lend Debtors money post-petition when he was unaware of their bankruptcy filing.  But at that point, Steven still had a valuable asset—the MF Global claim—that if successful could have paid a significant dividend to unsecured creditors.  The chapter 7 trustee apparently thought the same when he filed a report of assets.  By the time the trustee submitted an amended report reflecting that Debtors had no assets for distribution, Keith had ceased loaning funds to Debtors.  Thus, Keith has not shown that he was somehow duped into giving money for that brief time in the first few months of the case.  In fact, Keith gave Debtors $3,020 post-petition, far less than the approximately $75,000 loaned pre-petition, and they eventually repaid $3,800.  There is no evidence that Respondents were injured, let alone

21

prejudiced merely because Debtors received an inconsequential amount of additional loans from Keith after they filed for bankruptcy.

Similarly, Steven's repeated promises to repay Keith's discharged debt do not absolve Respondents from their unlawful actions.  It is true that the Bankruptcy Code does not prohibit debtors from voluntarily repaying any debt.  *See* 11 U.S.C. § 524(f).  But the discharge injunction clearly enjoins creditors from attempting to collect discharged debts.  *See* 11 U.S.C. § 524(a)(2).  Keith had been told by bankruptcy lawyers in September 2012 that the debt was discharged and uncollectible.  Yet he proceeded with collection efforts for seven years, not because Steven had promised to make good on the debt, but because he thought Debtors and Shirley had defrauded him.  In other words, Keith was not lured into wrongdoing by Steven's assurances of forthcoming payments.  Rather, Keith acted out of a desire for revenge, as evidenced by the increasingly hostile and antagonistic tone of his post-discharge communications with his stepmother and stepbrother.

Paulson and Eich actually possessed the legal acumen to ascertain the relevant facts and educate themselves (and their client) on the applicable law.  Inexplicably, they relied on *Keith's* assurances that his actions were legal.  They cannot now claim that statements by Steven were the impetus for their ill-fated decisions to move forward with collecting discharged debt.

The Court recognizes that Steven did not help his cause here.  In an effort to maintain family peace, he agreed to repay Keith's sizeable debt even though he owed the IRS a significant sum and had not yet resumed steady employment.  It is no surprise that Keith seized the opportunity to recoup some of his losses, which led to constant inquiries about when that would occur.  But after a while, Keith went too far, and his behavior crossed the line.  Debtors undoubtedly should have returned to the bankruptcy court years ago to put an end to this saga.

But their broken promises and good faith attempts to avoid litigation do not constitute grounds to equitably estop them from enforcing the discharge injunction against Respondents.

## III.   Remedies

Having found that Respondents each violated the discharge injunction and will be held in civil contempt, the next task is to assess damages and determine an appropriate remedy. *See In re Kimball Hill, Inc*, 620 B.R. at 903. In doing so, the Court is guided by the notion that these proceedings "are coercive and remedial, not punitive in nature and sanctions for civil contempt are designed to compel . . . compliance with an existing court order or to compensate . . . for losses sustained as a result." *Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 738 (7th Cir. 1999).

Debtors request the following: (1) Emotional damages: $400,000 total—$200,000 for Steven and $200,000 for Tina; (2) Punitive damages: $20,000 from Keith individually; $10,000 from Keith and Paulson jointly and severally; and $50,000 from Keith and Eich jointly and severally; (3) Attorney fees and costs for the Minnesota litigation, South Dakota litigation, and civil contempt proceedings in the bankruptcy court; and (4) Injunctive Relief: Dismissal of the South Dakota litigation against Debtors and Shirley. Some but not all the relief sought will be granted.

### A.   Emotional Damages

Debtors failed to show that an award of emotional damages is appropriate in this case. Courts have held that emotional damages are permitted as sanctions for breach of the discharge injunction because these damages are supposed to be compensatory in nature. *See Romanucci & Blandin, LLC v. Lempesis*, 16 C 9710, 2017 WL 4401643 (N.D. Ill. May 4, 2017).[10] However,

---

[10] Because emotional damages are a relevant component of the remedies analysis, the Court overrules Respondents' trial objection to this line of questioning. *See* Respondents' Joint Post-Evidentiary Hearing Arguments Related to Objections, Dkt. #130.

claims for emotional damages tend to raise concerns due to their ease of being manufactured. *Aiello v. Providian Fin. Corp.*, 239 F.3d 876, 880 (7th Cir. 2001). As such, the injured party must "show demonstrable emotional distress, not just point to circumstances. . . which might support an inference of such injury." *Alston v. King*, 231 F.3d 383, 388 (7th Cir. 2000).

Debtors certainly painted a compelling picture of the angst they experienced as Keith became more antagonistic and litigious over the years. They credibly shared how his unrelenting demands for repayment left them scared and stressed out. Although they did not seek professional care, Steven pointed to guilt and stress manifesting as dreams and Tina pointed to a legitimate fear of Keith and the use of sleeping pills. That said, the evidence presented is insufficient to support the requested amount of emotional damages.

The Court recognizes the very real trauma that Respondents needlessly caused Debtors and their family. But as already discussed, Debtors could have and should have been more proactive in taking steps to bring this unfortunate situation to resolution much sooner. Since 2012, Keith has been relentless in trying to collect on his debt. Paulson and Eich each filed collection lawsuits on Keith's behalf in 2017 and 2018. While Debtors raised the discharge injunction as a defense in those state court proceedings, they did not assert their rights before the bankruptcy court until 2019.

Debtors understandably tried to placate Keith with promises to make him whole and thereby resolve a family dispute without court intervention. But in choosing to not immediately object to all the blatant violations of the discharge injunction, Debtors missed an opportunity to mitigate their damages. Thus, the Court thus declines to award any emotional damages.

24

**B.**       **<u>Punitive Damages</u>**

Debtors requested punitive damages against Keith individually, against Paulson and Keith jointly and severally, and against Eich and Keith jointly and severally.  After *Taggart*, the question of a bankruptcy court's authority to award punitive damages as a sanction for civil contempt arguably remains unsettled.  *See e.g.*, *In re GYPC, Inc.*, Case No. 17-31030, Adv. No. 19-3054, 2021 WL 5561016, at *17 n. 12 (Bankr. S.D. Ohio Nov. 22, 2021) (holding that bankruptcy court's civil contempt power includes the authority to compensate a party for damages but not to issue punitive damages as a remedy).  But under existing Seventh Circuit precedent, courts are permitted to award punitive damages for violations of the discharge injunction, specifically where the creditors' conduct was particularly egregious.  *See Romanucci & Blandin*, 2017 WL 4401643, at *7 (compiling cases).  This is one of those rare instances where punitive damages are warranted but against Paulson only.

When deciding to award punitive damages, "courts that have awarded punitive sanctions for violations of the discharge injunction require actions taken with either malevolent intent or a clear disregard and disrespect of the bankruptcy laws . . . it is not sufficient to merely show that the actions were deliberate."  *In re Vazquez*, 221 B.R. 222, 232 (Bankr. N.D. Ill. 1998).  While no exact calculus can determine what are appropriate punitive damages, the Supreme Court has maintained that "a general concern of reasonableness . . . properly enters into the . . .  calculus."  *BMW of N. America, Inc. v. Gore*, 517 U.S. 559, 583, 116 S.Ct. 1589, 1602, 134 L.Ed.2d 809 (1996).

No doubt, Keith acted egregiously during the post-discharge period *before* he hired counsel to sue Debtors in state court.  On the other hand, assessing his actions for purposes of imposing punitive damages is complicated by the existence of collectible post-petition loans. The

parties agreed that Debtors received a total of $3,020 in 2011 and 2012, post-petition, and repaid a total of $3,800 in 2014 and 2015, post-discharge. Keith later argued in 2018 during the Minnesota litigation that he had calculated an unpaid post-petition balance of $8,027. Because Debtors did not offer evidence of the post-petition loan terms, it is impossible for the Court to say that Keith was wrong. More importantly, no evidence was presented to help the Court differentiate between instances when Keith was unlawfully attempting to collect pre-petition monies versus legitimately demanding repayment of post-petition monies. Given those uncertainties, punitive damages against Keith are not appropriate.

However, Paulson, in filing the Minnesota lawsuit where he undoubtedly sought to collect pre-petition discharged amounts only (minus the $3,800), acted in a manner that demonstrated a clear disregard for bankruptcy laws. As an experienced bankruptcy lawyer, he understood and should have known that these collection actions were not permitted by the discharge injunction. Indeed, he refused to heed Miller's warnings before filing or to review the case law that was brought to his attention after the filing. He failed to do the requisite research that could have stopped these unlawful proceedings years ago, and he failed to act to protect his client. Even worse, Paulson conceded at trial that he was not challenging dischargeability in state court where concurrent jurisdiction would exist if the claim arose under section 523(a)(3)(B). In sum, punitive damages are justified and needed to deter future wrongdoing by bankruptcy counsel. Accordingly, the Court awards Debtors $1,000 from Paulson.

With regard to Eich and the South Dakota litigation, the Court declines to impose punitive damages. Her behavior at the beginning of her representation was negligent. Having never practiced bankruptcy before and lacking an appreciation for the impact that may have had on the case she was pursuing, Eich should have consulted a bankruptcy attorney—at the very

26

least, Paulson!  Still, once she discovered the problems with her case, Eich testified credibly about working to rectify the situation, including convincing Keith to amend the complaint to ensure that only post-petition debts were at stake.

Her ongoing demand for a $50,000 settlement from Debtors and Shirley could be construed as an attempted end run around the discharge injunction.  But Debtors did not present contrary evidence to show that number was wildly off the mark.  Debtors argue that neither Shirley nor Tina bore any risk of liability but the July 2009 investment solicitation email to Keith originated from Shirley's email account and included Tina's name and contact information. Claims against Shirley for breach of fiduciary duty and Tina for breach of contract/fraud might have been weak but they survived a motion to dismiss and thus had some nominal value.

Keith thought Debtors owed $8,027 but settlement demands are typically higher to start as parties expect to meet in the middle.  Debtors never countered with their own figure, not even a nuisance amount.  Instead, they ended the discussions and finally initiated civil contempt proceedings in the bankruptcy court, which halted the South Dakota litigation.  To be clear, this Court finds that Eich's performance was deficient but, unlike Paulson, her actions do not reflect a malevolent intent or disregard for the bankruptcy laws to support punitive damages.

As for Keith and the Minnesota litigation, the Court will not hold him responsible for Paulson's shortcomings.  Keith may have engaged in attorney-shopping until he found a lawyer willing to greenlight his mostly unlawful collection efforts.  Still, Keith has no legal training and is certainly not experienced in bankruptcy matters.  The same analysis applies for Keith with respect to the South Dakota litigation.  Eich was not as knowledgeable as Paulson about bankruptcy, but she had the ability to learn and process the law in a way that Keith does not.

Keith relied on his attorneys to guide him. The Court will not penalize him for deferring to their "expertise."

### C.        Attorney Fees and Costs

Debtors are entitled to an award of reasonable attorney's fees and costs for the civil contempt proceedings only. When considering whether to award attorney's fees, courts start with the "bedrock principle known as the American Rule: Each litigant pays his own attorney's fees, win or lose, unless a statute or contract provides otherwise." *In re Hazelton*, 622 B.R. 354, 365 (Bankr. W.D. Wis. 2020) (quoting *Baker Botts L.L.P. v. ASARCO LLC*, 576 U.S. 121, 126, 135 S.Ct. 2158, 192 L.Ed.2d 208 (2015)). The violation of the discharge injunction is one circumstance that provides otherwise. *See Cox v. Zale Delaware, Inc*, 239 F.3d 910, 916 (7th Cir. 2001).

Debtors incurred expenses in retaining attorneys to protect their interests in both the state courts and the bankruptcy court. But the Court will not award fees and costs for the state court proceedings. As already explained, Keith may have had a valid breach of contract or fraud claim against them in connection with the post-petition loan amount. Debtors simply did not account for the fact that some part of his collection actions, even against Shirley, may be lawful. Thus, requiring Respondents to reimburse them for their collection action defenses in state court, particularly since it took Debtors seven years to pursue civil contempt sanctions for the repeated discharge injunction violations, would be improper.

The bankruptcy court proceedings are a different story. Simply put, Respondents never should have allowed this matter to progress this far. They presented no case law or statutory support for the unreasoned arguments they made about the applicability of section 523(a)(3)(B), partial dischargeability, or the lack of formal notice. Had they reviewed the fact discovery and

28

conducted basic research, they would have known that their "discharge injunction defense" was doomed from the start.  Accordingly, Debtors are entitled to recover reasonable fees and costs jointly and severally from Paulson and Eich.  Keith was simply following their lead.  That is not to say that he too should not have taken affirmative steps to resolve this matter short of an evidentiary hearing.  And his credibility is definitely questionable.  But it was his lawyers who filed and prosecuted the collection actions without regard for the law and continued to rationalize their behavior before this Court.  They should be held responsible for this litigation, not their client.

To be clear, Debtors may seek a reasonable amount of attorney fees and costs incurred in pursuing and recovering sanctions for the discharge injunction violations only.  In reviewing all their fees and costs, they will need to adjust for the fact that this contested proceeding raised the issue of pre-petition collections –which are prohibited—*and* post-petition collections—which are not prohibited.  The Court encourages counsel for Paulson and Eich and Debtors to meet and confer and reach an agreement on an appropriate number.[11]

### D.    Injunctive Relief

Finally, injunctive relief is warranted here against Keith in order to bring closure to these parties and this matter.   Monetary sanctions are not the only tool a bankruptcy court has in its toolbox.  Sanctions may also include other orders to bring parties into compliance with the discharge order, including ordering a party to dismiss their court proceedings. *See In re Kimball Hill, Inc.*, 565 B.R. at 901-02 (vacated and remanded on other grounds, *Fid. and Deposit Co. of Maryland v. TRG Venture Two, LLC,* 19-C-389, 2019 WL 5208853 (Oct.  16, 2019)).  While

---

[11]  In light of this Court's finding, Respondents' trial objection to entry of billing records is overruled as moot.  *See* Respondents' Joint Post-Evidentiary Hearing Arguments Related to Objections, Dkt. #130.

federal courts are limited in granting injunctions which stay state court proceedings, *see* 28 U.S.C. § 2283, they may order a party to dismiss state court claims that violate the discharge injunction. *See id*. Sanctions may also include other orders for specific performance such as requiring reinstating a loan. *See In re McDonald*, 336 B.R. 380, 386 (Bankr. N.D. Ill. 2006) (reinstatement of a mortgage after foreclosure in violation of discharge).

Keith's disregard for the bankruptcy process and the discharge injunction cannot be overlooked merely because Keith was disappointed by his stepbrother and his lawyers fell short. Keith's own behavior (which this Court witnessed at trial) is inexcusable. While the Court concluded that no award of punitive damages or attorney fees and costs was warranted against him, an order for Keith and Eich to dismiss the South Dakota litigation against Debtors with prejudice is befitting. Enough is enough. Ten years of litigation over these pre-petition and post-petition loans must end. Debtors are entitled to the fresh start promised by the Bankruptcy Code.

Debtors also ask in their post-trial brief that the Court order Keith to dismiss the South Dakota litigation against Shirley, which also makes sense. As Keith and Eich testified about the South Dakota litigation, it was clear that Keith did not have much of an idea of the legal theory that he was asserting, and Eich seemed very concerned with the likelihood of success. Even the state court judge expressed skepticism. This Court would be justified in concluding that continued litigation of the South Dakota lawsuit against Shirley also violates the discharge injunction. But because Debtors' civil contempt motion sought dismissal of the proceedings as to them alone, the Court believes it is important that Keith receive notice and an opportunity to respond before the Court imposes such a sanction with respect to Shirley.

**CONCLUSION**

For all the foregoing reasons, Debtors' motion for civil contempt for violating the discharge injunction is granted as to Respondents with sanctions awarded as follows:

1.      No emotional damages will be assessed.

2.      Punitive damages are awarded against Paulson Law Firm LLC in the amount of $1,000, payable to Steven Sorensen and Tina Sorensen within 45 days of entry of this order via a cashier's check or money order sent to their counsel, Nick Wooten.  No punitive damages will be assessed against Keith Schallenkamp or Eich Law Office Prof. LLC.

3.      Reasonable attorney fees and costs will be awarded to Steven Sorensen and Tina Sorensen for prosecuting this motion for civil contempt in the bankruptcy court as to the discharged pre-petition debt, with Paulson Law Firm LLC and Eich Law Office Prof. LLC found to be jointly and severally liable.  No fee award will be assessed against Keith Schallenkamp. Counsel for the parties are ordered to meet and confer and attempt to agree on an amount. Should those discussions fail, counsel for Steven Sorensen and Tina Sorensen shall file an itemized statement of fees and costs within 45 days of entry of this order.  Counsel for Paulson Law Firm LLC and Eich Law Office Prof. LLC may file a written objection within 14 days.

4.      Injunctive Relief:  Keith Schallenkamp and Eich Law Office Prof. LLC are ordered to dismiss with prejudice the South Dakota litigation against Steven Sorensen and Tina Sorensen within 60 days of entry of this order.  Keith Schallenkamp may voluntarily dismiss with prejudice the South Dakota litigation against Shirley Schallenkamp.  Each party will bear their own costs.   Keith is ordered to show cause why this Court should not impose a further sanction of enjoining him or anyone acting on his behalf from commencing or continuing any litigation in any forum against Steven Sorensen, Tina Sorensen, or Shirley Schallenkamp to

31

recover on any debt arising from loans between these parties under any theory of liability.  Keith

is ordered to file a statement of his position within 45 days of entry of this order.

5.       A post-ruling status hearing is set for September 16, 2022, at 9:30AM on Zoom

for Government.


                                                      ENTER:

Dated:  July 13, 2022


                                                      Honorable LaShonda A. Hunt
                                                      United States Bankruptcy Judge